# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

JAMES S.,[1]

                    Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

                  Defendant.

Case No. 4:20-cv-00027-TMB

## DECISION AND ORDER

On or about February 10, 2014, James S. ("Plaintiff") filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning on March 17, 2010.[3] Plaintiff later amended the alleged onset date to July 31, 2014.[4] Plaintiff has exhausted his administrative remedies and filed a

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brought claims only under Title II. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).

[3] Administrative Record ("A.R.") 15, 231, 235.

[4] A.R. 15, 80, 338.

Complaint seeking relief from this Court.[5]  Plaintiff filed his opening brief requesting reversal and remand for the immediate payment of benefits on November 20, 2020.[6]  The Commissioner filed a response brief.[7]  Plaintiff filed his reply on December 24, 2020.[8]  Oral argument was not requested and was not necessary to the Court's decision.  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9]  For the reasons set forth below, Plaintiff's request for relief will be GRANTED.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10]  "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[12]  In reviewing the agency's determination, the Court considers the

---

[5] Docket 1 (Plaintiff's Compl.).

[6] Docket 16 (Plaintiff's Br.).

[7] Docket 18 (Defendant's Br.).

[8] Docket 19 (Reply).

[9] 42 U.S.C. § 405(g).

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975)

evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[15]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[17]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[18]

---

(per curiam).

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[17] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[19]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[20]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[21]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[22]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[23]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[24]  If a claimant establishes a

---

[19] 42 U.S.C. § 423(a).

[20] 42 U.S.C. § 1381a.

[21] 42 U.S.C. § 423(d)(1)(A).

[22] 42 U.S.C. § 423(d)(2)(A).

[23] 20 C.F.R. § 404.1520(a)(4).

[24] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai*

prima facie case, the burden of proof then shifts to the agency at step five.[25] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[26] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[27] *The ALJ determined that Plaintiff had not engaged in substantial activity from the amended alleged onset date of July 31, 2014 through the date last insured of December 31, 2015.*[28]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[29] *The ALJ determined that Plaintiff had the following severe impairments: chronic obstructive pulmonary disease (COPD), sarcoidosis, and cervical spine degenerative disc disease. The ALJ determined that Plaintiff's right shoulder condition and coronary artery disease were not medically determinable*

---

*v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[25] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[26] *Tackett*, 180 F.3d at 1101.

[27] 20 C.F.R. § 404.1520(a)(4)(i).

[28] A.R. 18.

[29] 20 C.F.R. § 404.1520(a)(4)(ii).

impairments and Plaintiff's Barrett's esophagus, hypertension, obesity, and depressive disorder were non-severe impairments.[30]

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[31] *The ALJ determined that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[32]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments which are not severe.[33] *The ALJ determined that the Plaintiff had the residual functional capacity to perform light work with the following limitations: frequent climbing of ramps or stairs, ladders, ropes, or scaffolds; frequent balancing and reaching in all directions; avoiding concentrated exposure to extreme cold, humidity, excessive vibration, operational control*

---

[30] A.R. 18–20.

[31] 20 C.F.R. § 404.1520(a)(4)(iii).

[32] A.R. 20.

[33] 20 C.F.R. § 404.1520(a)(4).

*of moving machinery, unprotected heights, and hazardous machinery; and avoiding moderate exposure to irritants such as odors, dusts, gases, and poorly ventilated areas.*[34]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[35] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that, through the date insured, Plaintiff was unable to perform any past relevant work.*[36]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[37] *The ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including basket filler (DOT 529.687-010, light, SVP 1); storage rental clerk (DOT 295.367-026, light, SVP 2); and office helper (DOT 239.567-010, light, SVP 2).*[38]

---

[34] A.R. 21.

[35] 20 C.F.R. § 404.1520(a)(4)(iv).

[36] A.R. 26.

[37] 20 C.F.R. § 404.1520(a)(4)(v).

[38] A.R. 27.

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from July 31, 2014, the amended alleged onset date, through December 31, 2015, the date last insured.[39]

### III.     PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1963 and was 51 years old on his amended onset date of July 31, 2014.[40]  He reported working until March 16, 2010 as an owner of a fire equipment sales and service business.  Before becoming a small business owner, Plaintiff worked in fire equipment sales and service; in auto repair; and vehicle painting.[41]  Plaintiff's first application was denied; he testified without representation at a hearing on October 21, 2011; and the ALJ issued an unfavorable decision on January 10, 2012.[42]  The Appeals Council denied review on March 15, 2013.[43]  Plaintiff applied again on or about February 10, 2014 and was denied at the initial level on June 24, 2014.[44]  He testified without representation at a hearing on May 6, 2015.[45]  The ALJ issued an unfavorable ruling on January 29, 2016.[46]  On June 28, 2017, the Appeals Council remanded the case back to the ALJ to: 1) address the presumption of non-disability arising from the previous prior

---

[39] A.R. 27.

[40] A.R. 592.

[41] A.R. 57–65, 687.

[42] A.R. 163–92, 203–13.

[43] A.R. 217–19.

[44] A.R. 222, 231.

[45] A.R. 125–49.

[46] A.R. 232–45.

Case No. 4:20-cv-00027-TMB
Decision and Order
Page 8 of 45

unfavorable ALJ decision; 2) further assess Plaintiff's shoulder impairment; 3) give further consideration to the Plaintiff's RFC through the date last insured; and 4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base.[47] The Plaintiff testified with representation at two more hearings. The first hearing, on May 1, 2018, was continued to allow Plaintiff the opportunity to obtain an accurate spirometry test.[48] On June 14, 2019, Plaintiff testified with representation before ALJ LaCara.[49] ALJ LaCara issued an unfavorable decision on August 16, 2019.[50] On June 26, 2020, the Appeals Council denied Plaintiff's request for review.[51] On July 13, 2020, Plaintiff filed his Complaint; he is represented by counsel in this appeal.[52]

*Medical Records and Medical Opinion Evidence*

In this case, the Court's summary of the medical evidence focuses on the time period between July 31, 2014 and December 31, 2015.[53] However, the following are the relevant records before July 31, 2014[54]:

---

[47] A.R. 250–53.

[48] A.R. 117.

[49] A.R. 57–65.

[50] A.R. 15–28.

[51] A.R. 1–6.

[52] Docket 1.

[53] This is the period from Plaintiff's alleged onset date through his date last insured. A.R. 27.

[54] The Court's administrative record contains duplicates. To the extent possible, the Court will cite to the first record.

On May 23, 2013, Plaintiff saw Kenneth Starks, M.D., for follow up on multiple conditions. Dr. Starks diagnosed Plaintiff with sarcoidosis, syncope, cervical radiculopathy, Barrett's esophagus, history of probably gout, history of hyperlipidemia, and chronic steroid use. He recommended that Plaintiff "discontinue all driving."[55]

On June 4, 2013, Plaintiff had a pulmonary function test. Timothy Foote, M.D., at Fairbanks Memorial Hospital Pulmonary Function Lab, reviewed the results. Dr. Foote noted that Plaintiff applied maximum effort. He summarized that Plaintiff's FEV1 was 40% of predicted normal and the ratio of FEV1 to forced vital capacity (FVC) was 40% of predicted. He summarized that the spirometry tests reflected a severe obstructive pattern. He concluded that Plaintiff had severe obstructive pulmonary disease with evidence of hyperinflation and decreased diffusion capacity. Dr. Foote noted that Plaintiff's obstruction pattern had worsened since the last pulmonary function test in February 2012, with an FEV1 of 53% of predicted normal compared to the 40% of predicted normal during the test that day.[56]

On November 6, 2013, Dr. Starks completed a disability questionnaire. He diagnosed Plaintiff with pulmonary sarcoid and cervical myelopathy. Dr. Starks's prognosis for Plaintiff was "[p]oor for complete recovery" and he opined that Plaintiff was "unable to work." He opined that Plaintiff's impairments were expected to last at least 12 months.[57]

---

[55] A.R. 706–09.

[56] A.R. 704–05.

[57] A.R. 713–14.

On January 22, 2014, Dr. Starks prepared a letter on Plaintiff's behalf. He diagnosed Plaintiff with chronic sarcoidosis, chronic pain, and recurrent syncope. He opined that Plaintiff was unable to drive due to his impairments and unable to sit for prolonged periods of time "because of these illnesses and chronic pain." Dr. Starks also opined that Plaintiff would not be capable of serving on jury duty.[58]

On February 18, 2014, Plaintiff followed up with Dr. Starks. Dr. Starks noted that Plaintiff had an initial drop in his diffusing capacity between 2005 and 2008. Dr. Starks also noted that Plaintiff had been relatively stable since then, but his FEV1 values dropped to 1.47 liters in June 2013 with persistent DLCO at 18 mL/mmHg/min.[59]

On February 28, 2014, Plaintiff saw E. Lofton, CPFT, at Fairbanks Memorial Hospital, for pulmonary function testing. Plaintiff's recorded height was 71 inches. His FEV1 pre-bronchodilator was 1.82 liters. There was no notation of a post-bronchodilator test. His PEF was 2.84 liters/second. Plaintiff's DLCO 22.8 mL/mmHg/min pre-bronchodilator. Again, there was no notation of a post-bronchodilator test.[60]

On June 23, 2014, Gerald Morris, M.D., an agency reviewing physician, reviewed Plaintiff's medical records from April 15, 2014 through May 31, 2014 from the Pain Treatment Center, Dr. Starks, Fairbanks Memorial Hospital, and another provider. Dr. Morris opined that Plaintiff was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing, walking, and sitting about six hours in an eight-hour

---

[58] A.R. 715.

[59] A.R. 342.

[60] A.R. 873.

workday; and frequently climbing ladders, ropes, and scaffolds; frequently balancing. Dr. Morris opined that Plaintiff's right front, lateral, and overhead reaching was limited and he should avoid concentrated exposure to extreme cold, wetness, humidity, and hazards and avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.[61]

The following are the relevant records between July 31, 2014 and December 31, 2015:

On July 31, 2014, Plaintiff saw Nick Chavez, CPFT, at Fairbanks Memorial Hospital. Plaintiff's recorded height was 70 inches. His FEV1 levels were 1.34 liters pre-bronchodilator and 1.98 liters post-bronchodilator. CPFT Chavez noted that "[p]atient applied his maximum effort with much difficulty in that he was very light headed to the point of almost blacking out with each forced maneuver, requir[ing] several minutes to recover." CPFT Chavez "administered a unit dose of albuterol and Atrovent via HHNEB for ten minutes with no adverse reaction."[62] On the same date, Dr. Foote reviewed Plaintiff's pulmonary function testing. He opined that Plaintiff applied maximum effort. He noted that Plaintiff's expiratory flow volume loop demonstrated obstruction; his forced vital capacity (FVC) was 66% of predicted normal; his FEV1 was at 38% of predicted normal; his ratio of FEV1 to FVC was 42%; and his mid-flow rates were 15% of predicted normal. Dr. Foote pointed out that Plaintiff's FEV1 had deteriorated from 49% to 38% of predicted value, but Plaintiff showed "a statistically significant improvement in FEV1 in response to a bronchodilator." Dr. Foote opined that Plaintiff had a very severe obstruction with some

---

[61] A.R. 225–30.

[62] A.R. 936–37.

Case 4:20-cv-00027-TMB   Document 20   Filed 04/22/21   Page 12 of 45

degree of bronchial hyperreactivity and that the obstruction had deteriorated sequentially over previous studies. He indicated that there was no evidence of hyperinflation and that parenchymal involvement had decreased sequentially from Plaintiff's previous studies. The chest x-ray showed a "[s]low progressive increase in bilateral pulmonary nodularity and scarring" with "[s]table hilar adenopathy."[63]

On August 20, 2014, Dr. Starks wrote a letter to the University of Washington, Pulmonary Medicine. He requested assistance with the management of Plaintiff's sarcoid and obstructive lung disease. He summarized that Plaintiff had initially undergone treatment with steroids "with marginal improvement" and that Dr. Starks had added methotrexate. Dr. Starks noted that Plaintiff's pulmonary function tests "were relatively stable with a relatively normal diffusion capacity dating back to 2009," but that Plaintiff's FEV1 and FEF 25-75 tests had "markedly decreased over the last two years despite continued steroids." Dr. Starks also noted that Plaintiff's "imaging studies show progression of bilateral nodular opacities consistent with worsening sarcoidosis."[64]

On September 4, 2014, Plaintiff saw Dr. Starks. Plaintiff reported some diaphoresis with an increased dose of methotrexate. Dr. Starks also noted that although Plaintiff's prednisone dosage was increased to 30 mg daily, it was "not clear if this made any difference." Dr. Starks noted that Plaintiff had recently undergone repeated pulmonary function tests which showed "a progressive decline in his diffusion capacity as well as a marked decline in his FEF 25-75 low values as well as his FEV1." Dr. Starks

---

[63] A.R. 896–98.

[64] A.R. 957.

Case 4:20-cv-00027-TMB   Document 20   Filed 04/22/21   Page 13 of 45

reviewed Plaintiff's pulmonary function test results. He noted that Plaintiff had experienced an improvement in his diffusion capacity and had weaned himself down to 15mg daily of prednisone in February 2014, but then experienced a drop in his FEV1 value to 1.34. Dr. Starks also noted that Plaintiff's chest x-ray showed progression of his parenchymal disease. Dr. Starks increased Plaintiff's prednisone[65] to 20 mg daily from 10 mg daily and his methotrexate[66] to 25 mg weekly from 15 mg weekly.[67] Dr. Starks also noted that Plaintiff had "developed progressive pulmonary nodules on his chest x-ray findings." Dr. Starks decreased Plaintiff's methotrexate to ameliorate its side effects.[68]

On October 6, 2014, Plaintiff followed up with Dr. Starks. He reported walking 30–40 yards before having to stop due to dyspnea. He reported problems with syncope and episodes of asystole. Plaintiff also reported taking oxycodone[69] 10 mg four times a day for chest pain; prednisolone 40 mg daily; methotrexate 2.5mg x 15 once a week; Nexium[70]

---

[65] Prednisone/prednisone is used to treat conditions such as arthritis, blood problems, immune system disorders, skin and eye conditions, breathing problems, cancer, and severe allergies. *See* *https://www.webmd.com/drugs/2/drug-6307-2333/prednisolone-oral/prednisolone-liquid-oral/details* *and* *https://www.webmd.com/drugs/2/drug-6007-9383/prednisone-oral/prednisone-oral/details*.

[66] Methotrexate is used to treat certain types of cancer or to control severe psoriasis or rheumatoid arthritis. *See* *https://www.webmd.com/drugs/2/drug-3441/methotrexate-anti-rheumatic-oral/details*.

[67] A.R. 343.

[68] A.R. 939–40.

[69] Oxycodone is an opioid analgesic used to help relieve moderate to severe pain. *See* *https://www.webmd.com/drugs/2/drug-1025-5278/oxycodone-oral/oxycodone-oral/details*.

[70] Nexium is used to treat certain stomach and esophagus problems. *See* *https://www.webmd.com/drugs/2/drug-20536/nexium-oral/details*.

40 mg daily; lisinopril-hydrochlorothiazide[71] 10-12.5mg daily; Spiriva[72] daily; and albuterol[73] every four hours. Dr. Starks remarked that he was "[n]ot certain if sarcoid is involving [Plaintiff's] heart" and "[i]t is difficult to say how much of his current problem is secondary to the results of sarcoidosis and how much is secondary to his underlying COPD." A review of systems was positive for congestion, sputum production and shortness of breath, blurred vision, chest pain, and back pain. Dr. Starks noted that methotrexate did not seem to be helping and he wanted to have Plaintiff try alternative steroid sparing agents and Breo to treat Plaintiff's underlying COPD.[74] On the same date, Plaintiff had an x-ray of the chest. The x-ray showed "[c]oarsened parenchymal nodules with interstitial prominence and nodularity compatible with reported history of sarcoidosis."[75]

On November 12, 2014, Plaintiff saw Dr. Starks. He noted that Plaintiff's sarcoidosis was progressive with a drop in diffusing capacity and flow rates. He opined that this was likely due to a combined disease process.[76]

---

[71] Lisinopril-hydrochlorothiazide is used to treat high blood pressure. *See https://www.webmd.com/drugs/2/drug-2622/lisinopril-hydrochlorothiazide-oral/details.*

[72] Spiriva is used to control and prevent symptoms (such as wheezing, shortness of breath) caused by ongoing lung disease (COPD, which includes bronchitis and emphysema). *See https://www.webmd.com/drugs/2/drug-89062/spiriva-with-handihaler-inhalation/details.*

[73] Albuterol is used to prevent and treat wheezing and shortness of breath caused by breathing problems (such as asthma, chronic obstructive pulmonary disease). *See https://www.webmd.com/drugs/2/drug-4872-1697/albuterol-sulfate-inhalation/albuterol-salbutamol-breath-activated-inhaler-oral-inhalation/details.*

[74] A.R. 915–18.

[75] A.R. 914.

[76] A.R. 946–47. Imuran is used to prevent organ rejection in people who have received a kidney transplant. It is also used to treat rheumatoid arthritis. *See*

On December 19, 2014, Plaintiff followed up with Andy Holland, PA-C, at Starks MD, LLC. PA Holland adjusted Plaintiff's medications for sarcoidosis, taking him off methotrexate and starting Imuran.[77]

On February 11, 2015, Plaintiff saw Dr. Starks. He reported continued shortness of breath, chest and back rashes that started when he began using Imuran, abdominal discomfort, and a peripheral burning sensation that did not improve with medication. Dr. Starks increased some of Plaintiff's medications, continued Imuran, and decreased his prednisone prescription to 10 mg.[78]

On March 4, 2015, Plaintiff saw CPFT Chavez. His recorded height was 70 inches. His FEV1 was 1.43 liters pre-bronchodilator, but the test did not include a value post-bronchodilator. CPFT Chavez noted that "due to significant shortness of breath prior to doing this test, the patient had to use his rescue inhaler one hour prior to his appointment so a bronchodilator was not given for this reason." He added, "[p]atient applied his maximum effort with difficulty in that he was hav[ing] side ache pain with each forced vital capacity maneuver."[79] Dr. Foote reviewed the results and concluded that Plaintiff had very severe pulmonary obstruction, with a slight improvement in the degree of obstruction

---

*https://www.webmd.com/drugs/2/drug-13983/imuran-oral/details.*

[77] A.R. 948–49.

[78] A.R. 950–51.

[79] A.R. 344, 932–33.

from an FEV1 value of 38% of predicted normal to the present FEV1 value of 40% of predicted normal.[80]

On March 23, 2015, Thomas DeBlara, PA-C, completed a disability questionnaire. He diagnosed Plaintiff with syncope with collapse; sarcoidosis; and chest pain. He opined that Plaintiff could not stand or sit for six to eight hours.[81]

On March 30, 2015, Plaintiff followed up with PA Holland. He reported continued dyspnea and reported that it was exacerbated when his prednisone was decreased below 10 mg per day. He reported that his chronic chest, leg, neck, and back pain was "only temporarily moderated" by his oxycodone. He also reported peripheral neuropathy; "electrical storm" occipital head pain; a rash on his chest and back; three incidents of syncope in the past month; and abdominal pain. PA Holland noted that Plaintiff's chest x-ray from February 20, 2015 showed that Plaintiff's sarcoidosis was "nonprogressive." PA Holland adjusted Plaintiff's medications.[82] On the same date, PA Holland completed a residual functional capacity form. He diagnosed Plaintiff with sarcoidosis, chronic pain, peripheral neuropathy, and hypertension. PA Holland noted that Plaintiff had "distant breath sounds" and "grossly ab[normal] [pulmonary function tests]." He opined that Plaintiff's prognosis was poor and that Plaintiff was limited to standing and sitting up to two hours in an eight-hour workday due to dyspnea, fatigue, and back pain. He opined that Plaintiff would need to lie down during the day due to "lightheadedness, shortness of

---

[80] A.R. 930–31.

[81] A.R. 924–29.

[82] A.R. 943–45.

breath, and incapacitating pain" and could walk less than 100 yards without stopping at a normal pace. PA Holland also opined that Plaintiff could frequently reach to waist level; rarely reach above the shoulders, reach towards the floor, carefully handle objects, handle with fingers; and lift and carry less than 5 pounds. He specifically stated, "between [Plaintiff's] very poor pulmonary status and his chronic pain from multiple sources, his functional status varies from marginal to incapacitated." PA Holland opined that Plaintiff would not be able to return to his past work or do other work, noting specifically, "[b]ecause of the unpredictable fluctuations in his symptoms from bad to worse, it seems unlikely he could do any job with any level of consistency or dependability." PA Holland opined that Plaintiff's disability would likely get worse, "especially his pulmonary status."[83]

On April 28, 2015, the Anchorage Office of Disability Adjudication and Review ("ODAR") received a letter CPFT Chavez wrote on Plaintiff's behalf. He explained that he had been conducting Plaintiff's breathing tests for the last eight years when he was first diagnosed with sarcoidosis. CPFT Chavez opined that Plaintiff's test had always been significantly abnormal and that Plaintiff had always given his maximum effort. He opined that Plaintiff deserved disability benefits.[84]

On June 10, 2015, Plaintiff had a chest x-ray. The x-ray showed findings consistent with chronic interstitial lung disease and lymphadenopathy with known sarcoidosis and no acute pulmonary process evident.[85]

---

[83] A.R. 958–63.

[84] A.R. 938.

[85] A.R. 1131–32.

On October 1, 2015, Plaintiff underwent a pulmonary function test. Dr. Foote interpreted the results. He noted that there had been a "slight interval improvement in [the] degree of obstruction" and that FEV1 was 45% of predicted; FVC was 77% of predicted; and the ratio of FEV1 to FVC was 46% of predicted. Dr. Foote noted that Plaintiff's response to a bronchodilator was statistically significant. He assessed Plaintiff with very severe pulmonary obstruction, with a slight interval improvement in the degree of obstruction since Plaintiff's last evaluation. He also noted borderline hyperinflation, without interval change.[86]

On December 3, 2015, Plaintiff saw CPFT Chavez for a pulmonary function test. CPFT Chavez noted that Plaintiff applied his maximum effort with significant pleuritic type pain in his right upper quadrant and a near syncopal episode after each forced maneuver. Plaintiff's FEV1 level was 1.70 liters pre-bronchodilator and 2.03 liters post-bronchodilator. His height was recorded as 70 inches. Plaintiff's previous FEV1 levels were 1.76 liters pre-bronchodilator and 2.16 liters post-bronchodilator on October 1, 2015.[87]

On December 8, 2015, Plaintiff followed up Dr. Foote. Dr. Foote noted that Plaintiff's FEV1 was 45% of predicted; his FEF25-75 was 23% of predicted; and that there was a 19% improvement in FEV1 in response to a bronchodilator. He concluded that Plaintiff had severe lung obstruction "with some degree of response to [a] bronchodilator."

---

[86] A.R. 1129–30.

[87] A.R. 308–13.

Dr. Foote also noted that there had been no significant improvement in FEV1 since Plaintiff's last study on October 1, 2015.[88]

On March 30, 2016, Plaintiff underwent a pulmonary function test. Dr. Foote interpreted the results of the test. He noted that Plaintiff's FEV1 was 54% of predicted; his ratio of FEV1 to FVC was 46%; his FEF25-75 was 23% of predicted; and his response to a bronchodilator was statistically significant. Dr. Foote assessed Plaintiff with moderately severe, partially reversible obstruction and noted that there had been "interval improvement in the degree of obstruction since [the] previous study on [December 3, 2015]." He noted that the increased residual volume and increased ratio of residual volume to total lung capacity suggested hyperinflation.[89] Plaintiff's chest x-ray showed "[s]table reticulonodular opacities in this patient with known sarcoidosis. Stable left chest pacemaker."[90]

On October 17, 2016, Plaintiff had an x-ray of the chest. The x-ray showed no new airspace consolidation or suspicious pulmonary nodularity.[91]

On December 1, 2016, Plaintiff underwent a pulmonary function test. Dr. Foote summarized the results. Dr. Foote noted that Plaintiff's FEV1 was 59% of predicted; his FEF25-75 was 26% of predicted; and there was a 15% improvement in FEV1 in response to a bronchodilator. He assessed Plaintiff with moderate pulmonary obstruction with

---

[88] A.R. 307.

[89] A.R. 1090.

[90] A.R. 1091.

[91] A.R. 1084.

hyperinflation and noted, "[t]here has been [a] slight improvement in the degree of obstruction, and no progression in [the] degree of hyperinflation or parenchymal dysfunction."[92]

On March 24, 2017, Plaintiff saw Daniel Michael Strum, M.D., at Noble Street Internal Medicine. Dr. Strum assessed Plaintiff with chronic pain disorder, chest pain syndrome, decreased grip strength of the right hand, autonomic dysreflexia, chronic GERD, sarcoid, biceps muscle tear, sweating abnormality, cutis anserina, chronic right shoulder pain, and numbness of the right hand.[93]

On May 3, 2017, Plaintiff saw Dr. Strum. He reported sharp chest pain which limited his activity. Dr. Strum recommended increasing Plaintiff's opioid therapy as Plaintiff had not responded to other medication options and non-pharmaceutical options were "severely limited by financial obstacles given inability to work and consequent lack of insurance."[94]

On June 1, 2017, Plaintiff saw Dr. Strum. He reported taking six oxycodone and two OxyContin[95] per day and that he was "able to have some decent activity level with that, was able to drive his RV."[96]

---

[92] A.R. 1082.

[93] A.R. 1058–68.

[94] A.R. 1038–45.

[95] Dr. Strum's note describes OxyContin as "oxycodone that lasts 12 [hours]." A.R. 1030.

[96] A.R. 1030–37.

On July 5, 2017, Plaintiff followed up with Dr. Strum.  He reported being able to increase his activity level on a higher dose of oxycodone, including being able to interact with the dogs and kids and riding the train to Denali.  Dr. Strum opined that Plaintiff's "chronic pain and overall disability ultimately stems from his diffuse sarcoidosis, with chest pain being an atypical manifestation of sarcoid myocarditis."  He referred Plaintiff to UW Cardiology and noted that "for the time being [I] have focused on [symptoms]."[97]  On the same date, Dr. Strum completed an SSA generated Medical Source Statement of Ability to Do Work-Related Activities (Physical).  He opined that Plaintiff could lift and carry up to 10 pounds occasionally and sit for four hours, stand for one hour, and walk for one hour in an eight-hour workday.  Dr. Strum opined that Plaintiff would need to lie down during the rest of the eight-hour workday.  He also opined that Plaintiff could never climb stairs and ramps, ladders, or scaffolds and never balance, stoop, kneel, crouch, or crawl.  Dr. Strum opined that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, dust, odors, fumes or pulmonary irritants, extreme cold or heat, or vibrations.  Dr. Strum also opined that Plaintiff should not operate a motor vehicle and could not perform activities like shopping or travel without a companion.  He opined that Plaintiff could walk a block at a reasonable pace; climb a few steps with the use of a single handrail; prepare simple meals and feed himself; care for personal hygiene; and sort, handle, or use paper files.[98]

---

[97] A.R. 1025–29.

[98] A.R. 998–1003.

On September 28, 2017, Plaintiff followed up with Dr. Strum. He reported having well managed pain and that he had "[c]leaned up his property." Dr. Strum assessed Plaintiff with decreased white blood cell count and chronic pain syndrome. He increased Plaintiff's oxycodone prescription after discussing "the risk of death [due to] respiratory depression associated with taking that amount of opioids." Dr. Strum provided Plaintiff with Narcan "in case of overdose." Dr. Strum also assessed Plaintiff with "[m]oderate persistent reactive airway disease without complication" and sarcoid. He noted that Plaintiff's sarcoid was "well-controlled presently and [Plaintiff was] actually doing better than he has in years but [Plaintiff was] not adequately tolerating his current therapy." He noted that Plaintiff's "[pulmonary function tests] show[ed] 15% improvement with [a] bronchodi[lator]." Dr. Strum recommended a consultation with the Mayo Clinic "given failure with methotrexate and leukocytopenia [secondary to] azathioprine." Dr. Strum assessed Plaintiff with anorexia; early satiety, possibly secondary to sarcoid inflammatory process; chronic essential hypertension, well controlled; and chest pain syndrome, suspected secondary to sarcoidosis.[99]

On October 26, 2017, Plaintiff saw Dr. Strum. He reported increased pain affecting sleep and activity. Dr. Strum adjusted Plaintiff's pain medications.[100]

On December 27, 2017, Plaintiff followed up with Dr. Strum. He assessed Plaintiff with uncontrolled chest pain syndrome caused by sarcoidosis. He opined that Plaintiff's "[a]typical sarcoid [disease] requiring immunomodulation with azathioprine suggests

---

[99] A.R. 1018–24.

[100] A.R. 1012–17.

Case 4:20-cv-00027-TMB   Document 20   Filed 04/22/21   Page 23 of 45

possibility of myocardial pathology." Dr. Strum also assessed Plaintiff with uncontrolled sarcoid; chronic uncontrolled Barrett's esophagus with dysplasia; uncontrolled autonomic dysreflexia "[i]n setting of sarcoidosis"; controlled hypertension; and resolved anorexia.[101]

On March 20, 2018, Dr. Strum wrote a letter on Plaintiff's behalf. Dr. Strum opined that Plaintiff was "well and truly disabled and entitled to full benefits." He noted Plaintiff's "inability to return to work reflects the severity of his illness and not his desire to return to work nor the dedication with which he has pursued that objective."[102]

On April 12, 2018, Dr. Strum wrote another letter on Plaintiff's behalf. Dr. Strum noted that "[d]ue to multiple medical conditions, [Plaintiff] is unable to drive to Anchorage for his hearing."[103]

On May 30, 2018, Plaintiff underwent a pulmonary function test. Dr. Foote summarized the results. He noted that Plaintiff applied good effort and became symptomatic with respiratory symptoms during the test. Dr. Foote noted that FEV1 was 63% of predicted. The test showed that Plaintiff's FEV1 level was 2.39 liters pre-bronchodilator and 2.06 liters post-bronchodilator. It was noted that Albuterol was given for pre/post-bronchodilator testing. Dr. Foote also noted that FEF 25-75 was 32% of predicted and that there was no statistically significant change in FEV1 in response to a bronchodilator. He assessed Plaintiff with moderate pulmonary obstruction, not

---

[101] A.R. 1005–1011.

[102] A.R. 1004.

[103] A.R. 1133.

reversible.  Dr. Foote also noted a slight increase in the degree of obstruction since the previous study on December 1, 2016.[104]

*Function Reports*

On April 23, 2014, Plaintiff completed a function report.  He reported having sarcoidosis which affected his breathing and made him very tired and "low on energy." He reported having chest pain, shoulder pain, and that his fingers felt "like needles" and were "going to pop" when he moved his head in certain positions.  He reported needing oxycodone 4-5 times a day for pain.  He reported watching over his ailing mother, watching over his grandkids, and trying to help around the house.  Plaintiff indicated that he either skipped or needed help with personal care at times, specifically stating, "[s]ome days are better than others, but nothing is consistent, can't make plans, have to wait to see how I can move and how I feel and just take it one day at a time . . ."  He reported passing out without warning and that he had suffered injuries as a result of these incidents.  He indicated that he could prepare cereal or a sandwich, but that heat or steam made him lightheaded or dizzy.  He also indicated that he tried to help with household chores and yardwork such as wiping counters, loading the dishwasher, and fixing things, but that "sometimes [it] takes days or weeks to complete some things."  He reported that he did not drive and that his conditions affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, seeing, memory, completing tasks, concentration, following instructions, and using his hands.  He noted that he timed himself walking and that he could walk 93 steps in two minutes, but he need four minutes rest to

---

[104] A.R. 1139.

make it back and was tired and winded. He indicated that his memory and concentration were affected by his medications. He also indicated that he used crutches on the days that his feet and legs swelled.[105]

On April 28, 2014, Plaintiff's wife, Gisela S., completed a third-party function report. She reported that Plaintiff was in constant pain, even with light exertion, and could not get out of bed on some days. She also reported that Plaintiff needed assistance with personal care at times and would pass out for no reason. Plaintiff's wife indicated that she did most of the household work and that Plaintiff could make a sandwich or snack, wipe down counters, hold a screwdriver, and ride a lawnmower "when feeling alright for [a] short period of time[ ]." She reported that Plaintiff did not do house or yardwork because he got dizzy easily, couldn't breath or catch his breath, and would pass out. She reported that Plaintiff did not drive and sometimes accompanied her to the grocery store, but Plaintiff would sit in the car while she shopped. Plaintiff's wife indicated that she paid the bills and handled the family expenses and that Plaintiff watched television, used Facebook, spent time with his grandkids, and talked to his family on the phone. She reported that Plaintiff's conditions affected lifting, squatting, bending, standing, reaching, sitting, kneeling, talking, stair climbing, seeing, memory, completing tasks, concentration, following instructions, using his hands, and getting along with others. She described that Plaintiff's feet would swell; he could barely move for three to five days after taking methotrexate; he was in so much pain that he could not go without oxycodone for any period of time; his chest hurt

---

[105] A.R. 636–45.

so bad that it shocked him into tears; he had black spots in his eyes that caused blindness for a time; and he had hot flashes causing fevers up to 104-105 degrees Fahrenheit.[106]

On July 2, 2014, Plaintiff's neighbor, MaryEllen O., wrote a letter on Plaintiff's behalf. She reported that as a friend and neighbor, she saw Plaintiff often. She indicated that, at times, Plaintiff did not seem "totally coherent due to the medication he is on." She also indicated that she had seen him totally out of breath and needing to sit down after walking up stairs. MaryEllen O. also reported seeing Plaintiff pass out in his yard after bending over to pick up leaves or trash and passing out while doing minor work on his house, resulting in him hitting "the wall so hard it put a hole in it." She stated, "[k]nowing [Plaintiff] he would rather be productive and work but truthfully [I] don't think he is physically capable to do so."[107]

*Hearing Testimony on May 1, 2018*

With representation, Plaintiff appeared a hearing before ALJ Cecelia LaCara on May 1, 2018. Preliminarily, Plaintiff's attorney requested a change to Plaintiff's onset date to July 31, 2014. On that date, Plaintiff's FEV1 level dropped to 1.34 liters in a pulmonary function test and Plaintiff's attorney opined that this FEV1 level met Listing 3.02.[108]

Jack Lebeau, M.D., testified as the medical expert. He opined that Plaintiff's GERD, Barrett's esophagus, sarcoidosis, COPD, chronic pain syndrome, a history of coronary artery disease, and syncope were medically determinable impairments. He

---

[106] A.R. 626–34.

[107] A.R. 666.

[108] A.R. 80, 936–37.

opined that Plaintiff met the listing criteria under 3.02, pulmonary insufficiency, based on Plaintiff's FEV1 levels on a July 31, 2014 pulmonary function test and partial FEV1 data from subsequent tests. He noted that Plaintiff did respond to a bronchodilator during the pulmonary function testing and the tests without a post-bronchodilator test were incomplete. Dr. Lebeau noted later in his testimony that the raw data in Plaintiff's pulmonary function tests was "consistent over time" and followed "a deteriorating course." However, Dr. Lebeau noted that the pulmonary function tests without the post-bronchodilator data were not entirely trustworthy and "[t]he only way I can see of getting [trustworthy data] is getting a test that's done absolutely properly with bronchodilation, with multiple attempts and so forth." The ALJ rescheduled the hearing until after Plaintiff obtained "a proper spirometry test."[109]

*Hearing on June 14, 2019*

On June 14, 2019, Plaintiff appeared and testified at the hearing continued from May 1, 2018 before ALJ LaCara. He testified only briefly about his past work.[110]

Jack Lebeau, M.D., testified as the medical expert. He opined that Plaintiff's main concern was sarcoidosis and the impairments connected to sarcoidosis. He noted that "despite treatment with both steroids and Methotrexate, which are traditional treatments, [Plaintiff]'s had progressive changes, which are obvious not just in the one where you see nodules, and scarring, and so forth, but in pulmonary functions, as to which he's had a great many." Dr. Lebeau also noted that Plaintiff had "very significant," and at times

---

[109] A.R. 85–117.

[110] A.R. 57–59.

severe, obstructive lung disease. Dr. Lebeau pointed to the pulmonary function test on December 3, 2015 with a FEV1 value of 1.70 and opined that on that date, Plaintiff "sort of turned a corner and started to meet listings." He opined that Plaintiff "worked very hard with his lung function test [on December 3, 2015], and . . ., what you see is what's real." Dr. LeBeau also noted the May 30, 2018 pulmonary test FEV1 results of 2.39 liters were well above the 1.70 listing requirement for Plaintiff's height. However, he opined that "when you have obstructive lung disease you can get variation in results." He also noted that Plaintiff's COPD and sarcoidosis were "not going away." Dr. Lebeau opined that, if Plaintiff did not meet a listing, his residual functional capacity would be limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally; standing for one hour at a time and for three hours a day; reaching overhead occasionally; no overhead lifting; pushing and pulling frequently; climbing stairs and ramps occasionally; never climbing ladders or scaffolds; balancing frequently; and stooping, crouching, or crawling occasionally. He opined that Plaintiff could frequently work with moving mechanical parts; never work at unprotected heights; and could occasionally work in environments with humidity and wetness, dusts, odors, and fumes.[111]

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical,[112] VE Weiss opined that Plaintiff could perform his past work as a small

---

[111] A.R. 48–55.

[112] The ALJ's first hypothetical was as follows:

> So for the first hypothetical let's assume that we have an individual of the same age, education, work experience as that of the Claimant, and who is limited to light work, except that the Claimant is limited to frequent balancing, climbing of ladders, ropes, and scaffolds, ramps, and stairs, frequent reaching in all directions, but . . . is to avoid concentrated exposure to extreme cold, humidity, excessive vibration,

business owner and fire equipment salesperson. He also opined that there was other work in the national economy that a hypothetical individual with same age, education, and work experience as Plaintiff could perform, including basket filler, storage rental clerk, and basic office helper. Based on the ALJ's second hypothetical,[113] VE Weiss opined that Plaintiff would not be able to perform his past work. He opined that an individual of Plaintiff's age, education, and work background would be able to perform jobs in the national economy, including call-out operator (DOT 237.367-010, sedentary, SVP 2) and charge account clerk (DOT 205.367-014, sedentary, SVP 2). Upon questioning by Plaintiff's attorney, VE Weiss agreed that if Plaintiff were limited to three hours of walking or standing in an eight-hour workday, Plaintiff would not be able to perform the full range of light work. VE Weiss opined that Plaintiff would be able to perform the call-out operator and charge account clerk positions. Based on Plaintiff's attorney's additional hypothetical limitation of "occasional reaching" in a sedentary job, VE Weiss opined that Plaintiff would

───────────────

and the operational control of moving machinery, unprotected heights, or hazardous machinery, and is to avoid moderate exposure to irritants, such as odors, dusts, gases, and poor ventilated areas. A.R. 66.

[113] The ALJ's second hypothetical was as follows:

So for the second hypothetical, again, we're looking at someone with the same age, education, and work experience as that of the Claimant, but now we're looking at someone who can only do light work with only the ability to stand a total of three hours and walk a total of one hour in an eight-hour workday with the normal breaks, sit up . . . to six hours in an eight-hour workday with normal breaks, limited to frequent bilateral push/pull. This person's limited to the occasional climbing of ramps or stairs, no climbing of ladders, ropes, or scaffolds, frequent balancing, the occasional stooping, kneeling, crouching, and crawling. This person's limited to frequent bilateral reaching to the front and to the side, occasional bilateral overhead reaching. This person's to avoid . . . moderate exposure to wetness and humidity, is to avoid moderate exposure to irritants, such as fumes, odors, dusts, gases, and poorly ventilated areas, and is to avoid all unprotected heights. A.R. 68–69.

be able to perform work as a telephone solicitor (DOT 299.357-014, sedentary, SVP 3) and telephone answerer (DOT 235.662-026, sedentary, SVP 3).  VE Weiss opined that Plaintiff would not retain employment if he needed to lay down on the job.[114]

## DISCUSSION

Plaintiff seeks remand and reversal of the Commissioner's last determination and the immediate payment of benefits.  Plaintiff argues that the ALJ: 1) "erred as a matter of law in finding that [Plaintiff] is capable of Light exertional work in the face of expert opinion evidence that he cannot do more than Less than Light exertional, and additional expert opinion evidence that he is limited to no more than four hours of standing and/or walking in an eight-hour workday"; and 2) erred by finding that Plaintiff did not meet or equal Listing 3.02 based on the medical opinion evidence of Dr. Lebeau.[115]  The Commissioner disputes Plaintiff's assertions.[116]  The Court will address Plaintiff's arguments as follows:

A.      Dr. Lebeau's RFC Opinion

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Lebeau's testimony regarding Plaintiff's RFC.[117]  He asserts that Dr. Lebeau's opinion that Plaintiff was limited to no more than four hours of standing and/or walking in an eight-hour workday should have been included in the RFC and

---

[114] A.R. 65–75.

[115] Docket 16 at 10–20; Docket 19 at 1–5.

[116] Docket 18 at 2–11.

[117] Although Plaintiff asserts that the ALJ was required to provide "specific and legitimate reasons" for rejecting Dr. Lebeau's medical opinions, Dr. Lebeau was not a treating or examining physician. *See Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017).

consequently, Plaintiff would not be capable of performing light work.[118] He also points out that Dr. Lebeau opined that the RFC applied only after December 3, 2015.[119]

An ALJ "must consider all medical opinion evidence."[120] The ALJ is also responsible for "resolving conflicts in medical testimony, and for resolving ambiguities."[121] Although an ALJ may only reject a treating or examining doctor's opinion by providing specific and legitimate reasons supported by substantial evidence, in this case, Dr. Lebeau was not a treating or examining physician, but a testifying medical expert.[122] Therefore, the ALJ could reject Dr. LeBeau's opinions as a non-examining physician "by reference to specific evidence in the medical record."[123]

### a. Dr. Lebeau's Walking and Standing Limitation

Here, the ALJ determined Plaintiff could perform "light work" with limitations.[124] The ALJ gave "some weight" to Dr. Lebeau's RFC opinion, but determined that Plaintiff's pulmonary function testing showed improvement of Plaintiff's symptoms with treatment, therefore, Plaintiff did not have all of the limitations opined by Dr. Lebeau.[125] The RFC

---

[118] Docket 16 at 10–18.

[119] Docket 16 at 7. *See also* A.R. 52–53.

[120] *Tommasetti v. Astrue,* 533 F. 3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).

[121] *Ford v. Saul,* 950 F.3d 1141, 1149 (9th Cir. 2020) (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995)).

[122] *Revels,* 874 F.3d at 654.

[123] *Sousa v. Callahan,* 143 F.3d 1240, 1244 (9th Cir. 1998).

[124] A.R. 20–21.

[125] A.R. 25.

did not include Dr. Lebeau's opinion that Plaintiff was limited to standing for three hours and walking for one hour in an eight-hour workday.[126]

The ALJ's reason for rejecting Dr. Lebeau's standing and walking limitation is not supported by the medical record. For example, in July 2014, Dr. Foote opined that Plaintiff showed very severe obstruction with some degree of bronchial hyperreactivity and that the obstruction had deteriorated sequentially over previous studies. The chest x-ray showed a slow, progressive increase in bilateral pulmonary nodularity and scarring.[127] In September 2014, Plaintiff's treating physician, Dr. Starks, noted Plaintiff's progressive decline in pulmonary function. He noted that testing showed a progressive decline in Plaintiff's diffusion capacity as well as a marked decline in his FEF 25-75 low values and FEV1 values. Dr. Starks also noted that Plaintiff had developed progressive pulmonary nodules on his chest x-ray findings.[128] Further testing in March 2015 continued to show very severe pulmonary obstruction.[129] Again, on October 1, 2015, testing showed very severe pulmonary obstruction, improved with a bronchodilator.[130] On December 3, 2015, testing showed severe obstruction with some improvement in FEV1 after bronchodilation.[131]

---

[126] A.R. 53.

[127] A.R. 896–98.

[128] A.R. 914–18.

[129] A.R. 930–31.

[130] A.R. 1129–30.

[131] A.R. 991–92.

The ALJ's rejection of Dr. Lebeau's opinion regarding Plaintiff's standing and walking limitations in the RFC is not supported by substantial evidence in the record.

b. *RFC After December 3, 2015*

At the June 2019 hearing, the ALJ asked Dr. Lebeau to provide an RFC in the event the ALJ determined Plaintiff did not meet a listing. Dr. Lebeau then indicated that the RFC he provided was for the time period after December 3, 2015.[132] "An ALJ errs when [she] rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it . . ."[133] In this case, the ALJ did not seek clarification that Dr. Lebeau was in fact testifying Plaintiff's RFC was limited to the time period after December 3, 2015. And, as shown below, the record does not support the application of an RFC between July 31, 2014 and December 3, 2015.

B.  Listing 3.02

At step three of the sequential evaluation process, the ALJ considers whether a claimant's impairment or combination of impairments meet(s) or equal(s) the severity of an impairment listed in Appendix 1 to Subpart P of the SSA regulations.[134] Each Listing sets forth the "symptoms, signs, and laboratory findings" which must be established to

---

[132] The ALJ asked:

"So my question is from July 2014 to December 5th, 2015 . . . there is some indication that [Plaintiff] didn't meet or equal the listing. If that's the case what would be his residual functional capacity at that time?"

Dr. Lebeau answered, "Well, I think I'd have to work from the December 3rd, 2015 data, which seems to indicate, and I think pretty clearly, he dilated noted repeatedly." A.R. 52.

[133] *Garrison v. Colvin,* 759 F.3d 995, 1012–13 (9th Cir. 2014).

[134] 20 C.F.R. § 404.1520(a)(4)(iii).

meet the Listing.[135]  If a condition meets or equals a Listing, the claimant is considered disabled without further inquiry.[136]  And, although the ALJ is not required "to state why a claimant failed to satisfy every different section of the listing of impairments,"[137] the ALJ must engage in some analysis when finding that a claimant does not meet a Listing.[138]

Listing 3.02 applies to chronic respiratory disorders due to any cause except cystic fibrosis.[139]  A claimant may meet Listing 3.02 in four different ways: 1) A forced expiratory volume in the first second of a forced expiratory maneuver value ("FEV1") at or below the listing level based on age, gender, and height under 3.02A; or 2) a forced vital capacity value ("FVC") at or below the listing level for age, gender, and height under 3.02B; or 3) a chronic impairment of gas exchange demonstrated by a diffusing capacity of the lungs for carbon monoxide value ("DLCO") or other tests under 3.02C; or 4) exacerbations or complications requiring hospitalizations under 3.02D.[140]

For an adult male over 20 years of age and 70 inches tall[141], such as Plaintiff, the listing-level FEV1 is 1.75 liters.[142]  The listing-level FVC is 2.20 liters for an adult male

---

[135] *Tackett,* 180 F.3d at 1099.

[136] 20 C.F.R. § 404.1520(d).

[137] *Gonzalez v. Sullivan,* 914 F.2d 1197, 1201 (9th Cir. 1990).

[138] *Lewis v. Apfel,* 236 F.3d 503, 512 (9th Cir. 2001) ("A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not [meet or equal a listed impairment].").

[139] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02(a)(Listing 3.02).

[140] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02A, 3.02B, 3.02C, or 3.02D.

[141] The record from the pulmonary function test on February 28, 2014 lists 71 inches as Plaintiff's height.  A.R. 873.

[142] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02A, Table I-B.

over 20 years of age and 70 inches tall.[143] The DLCO criteria for males 70 inches is 11.5 mL CO (STPD)/min/mmHg.[144] Plaintiff did not provide evidence of hospitalizations for his chronic respiratory disorders.

The primary measurement at issue in this case is Plaintiff's FEV1 values.[145] Regarding FEV1 values, the Listing explains that claimant must be medically stable at the time of the spirometry testing.[146] The Listing also provides, "[i]f you used a bronchodilator before the test and your FEV1 is less than 70 percent of your predicted normal value, we still require repeat spirometry after inhalation of a bronchodilator unless the supervising physician determines that it is not safe for you to take a bronchodilator again (in which case we may need to reschedule the test)." Further, the Listing states, "[i]f you do not have post-bronchodilator spirometry, the test report must explain why. We can use the results of spirometry administered without bronchodilators when the use of bronchodilators is medically contraindicated."[147]

In her decision, the ALJ concluded that Plaintiff's "pulmonary function testing did not meet the requirements of the listings" and pointed to the record on December 3, 2015 showing Plaintiff's FEV1 value was 1.70 pre-bronchodilator, but 2.30 post-bronchodilator

---

[143] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02B, Table II-B.

[144] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02C1, Table III.

[145] Plaintiff's arguments are limited to Listing 3.02A (FEV1 values) and it appears that these values are the only ones close to meeting or equaling Listing 3.02. *See* Docket 16; A.R. 20. *See also Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (The Court is "constrained to review the reasons the ALJ asserts.") (citation omitted).

[146] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.00E.2.a.

[147] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.00E.2.b.

and his FVC value was 3.58 pre-bronchodilator and 4.45 post-bronchodilator.[148]  The ALJ also gave little weight to Dr. Lebeau's opinion that Plaintiff would meet or medically equal Listing 3.02 "because Dr. Lebeau was not properly applying the listings and taking into consideration the post-bronchodilator testing."  The ALJ noted that Plaintiff's pulmonary function testing done after the hearing on May 1, 2018 "continued to show the claimant's lab values did not rise to listing level."[149]

Although many of Plaintiff's pulmonary function tests in the record showed percentages lower than 70% of predicted values for FEV1, not all of the records provided specific FEV1 values for the ALJ to review.[150]  Thus, the ALJ properly did not rely on those results.[151]  For the tests with pre- and post-bronchodilator data between July 31, 2014 and December 31, 2015, nearly all of Plaintiff's FEV1 values pre-bronchodilator were at or below listing level.  However, the pulmonary function tests that included post-bronchodilator results showed FEV1 levels above listing-level after bronchodilation.  For example, the test on July 31, 2014 showed FEV1 levels of 1.34 liters pre-bronchodilator and 1.98 liters post-bronchodilator.[152]  On March 4, 2015, Plaintiff's FEV1 level was 1.43 liters pre-bronchodilator, but the test did not include a value post-bronchodilator.  CPFT Chavez noted that Plaintiff required a rescue inhaler one hour prior to his appointment

---

[148] A.R. 20.

[149] A.R. 20.

[150] *e.g.,* A.R. 1082, 1090.

[151] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00E.

[152] A.R. 936–37.

"so a bronchodilator was not given for this reason."[153]  Plaintiff's October 1, 2015 test showed FEV1 levels of 1.76 liters pre-bronchodilator and 2.16 liters post-bronchodilator.[154]  The December 3, 2015 test showed an FEV1 level of 1.70 liters pre-bronchodilator and 2.03 liters post-bronchodilator.[155]  The May 2018 test showed an FEV1 of 2.39 liters pre-bronchodilator and 2.06 liters post-bronchodilator.[156]

Because Plaintiff's FEV1 scores after bronchodilation are outside the technical parameters of the Listing, Plaintiff does not meet the requirements of Listing 3.02.  Plaintiff also argues that his impairments equal a listing.[157]  Under the regulation in force during the relevant disability period, "medical equivalence" is established for a listed impairment if Plaintiff has "other findings related to [Plaintiff's] impairment that are at least of equal medical significance to the required criteria."  The regulation also specifies that the SSA will consider all relevant evidence about the impairment(s), including "the opinion given by one or more medical or psychological consultants designated by the Commissioner."[158]

Here, the ALJ concluded that Dr. Lebeau "was not properly applying the listings and taking into consideration the post-bronchodilator testing."[159]  Dr. Lebeau testified at

---

[153] A.R. 930–33.

[154] A.R. 992, 1129–30.

[155] A.R. 991–92.

[156] A.R. 1141.

[157] Docket 16 at 14–20.

[158] 20 C.F.R. § 1526 (a)–(c) (effective June 13, 2011 to March 26, 2017).

[159] A.R. 25.

two hearings. At the first hearing in May 2018, Dr. Lebeau opined that Plaintiff met the listing criteria under 3.02.[160] Dr. Lebeau noted that it was "striking how much improvement [Plaintiff] gets" with bronchodilation, but also noted that Plaintiff's pulmonary test data was "consistent over time" and was following "a deteriorating course."[161] At the second hearing on June 14, 2019, Dr. Lebeau opined again that Plaintiff "sort of turned a corner and started to meet listings" in December 2015, noting that Plaintiff's FEV1 data was "so close to the listing . . .1.70 or 1.75."[162] Even after reviewing the results of the spirometry test performed at the request of the ALJ on May 30, 2018, Dr. Lebeau continued to opine that Plaintiff met a listing between July 2014 and December 2015.[163] Specifically, he stated, "I think when you have obstructive lung disease you can get variation in results" and "[s]o I think it's sort of suggestive here that [Plaintiff] was meeting [a Listing] [in December 2015]."[164]

Further, according to the agency's rules in effect at the time of Plaintiff's application and during the relevant disability period, "increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations

---

[160] A.R. 91.

[161] A.R. 99.

[162] A.R. 50.

[163] A.R. 49–52.

[164] A.R. 50–51.

of intense and persistent symptoms."[165]  In this case, Dr. Lebeau noted that traditional medications for sarcoidosis and COPD were not working for Plaintiff during the period at issue.  He pointed to other medical findings, such as x-rays, to show Plaintiff would have equaled Listing 3.02.  Specifically, Dr. Lebeau testified, "despite treatment with both steroids and Methotrexate, which are traditional treatments, [Plaintiff]'s had progressive changes, which are obvious not just in the one where you see nodules, and scarring, and so forth, but in pulmonary functions, as to which he's had a great many" and "if we're going to use the listings he meets the listing, and he has good reason to, and he had many, many X-rays, many, many pulmonary function tests, and so forth, that more or less [show] the progression of [Plaintiff's lung impairments]."[166]

Although the record shows that a bronchodilator improved Plaintiff's FEV1 levels on pulmonary function tests to above listing-level, the record is replete with examples of providers increasing medications and trying different modalities to treat Plaintiff's sarcoidosis and COPD.  For example, in a letter to the University of Washington's pulmonary medicine department in August 2014, Dr. Starks noted Plaintiff's marked decrease in pulmonary function tests despite the continued use of steroids and explained that Plaintiff's imaging showed "progression of bilateral nodular opacities consistent with

---

[165] SSR 96-7p, *available at* 1996 WL 374186, at *7, *superseded by* SSR 16-3p (March 16, 2016).

[166] A.R. 49–50.

worsening sarcoidosis."[167]  Throughout 2014 and 2015, Dr. Starks and PA Holland made adjustments to Plaintiff's medications to treat his sarcoidosis and COPD conditions.[168]

Additionally, Dr. Lebeau's opinion is consistent with Plaintiff's treating providers' medical opinions.[169]  Multiple treating sources opined that Plaintiff's combined sarcoidosis and COPD rendered him disabled.  For example, Dr. Starks opined in November 2013 and again in January 2014 that Plaintiff was unable to work due to pulmonary sarcoidosis and cervical myelopathy.[170]  PA Holland opined that "between [Plaintiff's] very poor pulmonary status and his chronic pain from multiple sources, his functional status varies from marginal to incapacity."  He opined that Plaintiff's pulmonary status would likely get worse over time.[171]  Dr. Strum later opined in July 2017 and March 2018 that Plaintiff could perform only less than sedentary work and due to multiple medical conditions, he supported Plaintiff's entitlement to disability benefits.[172]  CPFT Chavez noted that Plaintiff had abnormal testing and opined that Plaintiff was disabled.[173]  Although Dr. Morris, the

---

[167] A.R. 957.

[168] A.R. 915–18, 939–40, 943–51.

[169] Dr. Lebeau testified, "despite treatment with both steroids and Methotrexate, which are traditional treatments, he's had progressive changes, which are obvious not just in the one where you see nodules, and scarring, and so forth, but in pulmonary functions, as to which he's had a great many" and "if we're going to use the listings he meets the listing, and he has good reason to, and he had many, many X-rays, many, many pulmonary function tests, and so forth, that more or less [show] the progression of this.  A.R. 49.

[170] A.R. 713–15.

[171] A.R. 958–63.

[172] A.R. 998–1003.

[173] A.R. 938.

agency's reviewing physician, opined in June 2014 that Plaintiff was capable of standing, walking, and sitting about six hours in an eight-hour workday, this opinion was rendered before the relevant disability period at issue here and is of little relevance.[174]

In this case, the ALJ focused solely on Plaintiff's FEV1 values and did not adequately consider or discuss medical equivalence as evidenced by the medical record and as testified to by Dr. Lebeau in two hearings.[175] The ALJ's reasons for discounting Dr. Lebeau's listing opinions were not supported by substantial evidence. This error was not harmless as Plaintiff would be considered disabled at step three in the sequential evaluation.

C.    Scope of Remand

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[176] A court follows a three-step analysis to determine whether a case raises the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits. "First, [a court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting

---

[174] A.R. 225–30. *See Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.") (citing *Fair v. Bowen,* 885 F.2d 597, 600 (9th Cir. 1989).

[175] A.R. 20.

[176] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

Case No. 4:20-cv-00027-TMB
Decision and Order
Page 42 of 45

evidence, whether claimant testimony or medical opinion.'"[177]  "Second, [a court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'"[178]  "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[179]  "Third, [a court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'"[180]  But, "even if all three requirements are met, [a court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[181]

      In this case, the medical record is fully developed and "free of conflicts, ambiguities, or gaps."[182]  The deficient pulmonary function tests in the medical record cannot be changed at this late date.  Second, the ALJ failed to provide sufficient reasons for rejecting Dr. Lebeau's expert testimony.  The third credit-as-true factor has also been satisfied.  The record does not support the ALJ's conclusion that Plaintiff's pulmonary

---

[177] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison*, 759 F.3d at 1020).

[178] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[179] *Treichler*, 775 F.3d at 1101.

[180] *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

[181] *Id.* (quoting *Garrison*, 759 F.3d at 1021).

[182] *Treichler,* 775 F.3d at 1103.  Although some of the pulmonary function tests in the record lack actual FEV1 pre- and post- bronchodilator data, any re-testing done now would be too remote. *e.g.,* A.R. 1082, 1090.  *See also* A.R. 115–117 (Discussion of test data at the May 2018 hearing).

function testing showed "improvement of [Plaintiff]'s symptoms with treatment."[183]  To the contrary, the record supports Dr. Lebeau's testimony that Plaintiff equaled Listing 3.02. Therefore, if credited as true, Dr. Lebeau's opinions establish that Plaintiff was disabled during the disability period at issue.

Finally, the Court's review of the record as a whole does not create a serious doubt that Plaintiff was disabled during the relevant time period.  Plaintiff has waited years for a decision in this case, enduring a previous remand by the Appeals Council for error by the same ALJ and three separate hearings after applying in 2014.[184]  The agency's own medical expert testified that Plaintiff should be considered disabled under Listing 3.02 and continued to opine the same even after reviewing the results of a pulmonary function test ordered by the ALJ.[185]  The calculation and award of benefits is warranted in this case.

///

//

/

---

[183] A.R. 25.

[184] A.R. 57–65, 111–15, 125–49, 252.

[185] A.R. 48–52, 91, 117.

Case No. 4:20-cv-00027-TMB
Decision and Order
Page 44 of 45

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were not free from legal error.   Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 16 is **GRANTED** as set forth herein, the Commissioner's final decision is **VACATED,** and the case is **REMANDED** for the calculation and award of benefits.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 22nd day of April, 2021 at Anchorage, Alaska.

*/s/ Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE